***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Hoag, along with the briefs and arguments on appeal. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms the Deputy Commissioner's holding and enters the following Opinion and Award, with some modifications.
 ***********
Plaintiff's motion that the Full Commission accept additional evidence is HEREBY GRANTED. Attorney Sean Coburn's affidavit of 19 September 2002 and Defendants' Responses to Plaintiff's Second Set of Interrogatories are HEREBY ADMITTED into evidence.
 ***********
The parties stipulated to an Industrial Commission Form 28B at oral arguments before the Full Commission. This form is date-stamped 28 April 2003. This form is HEREBY ADMITTED into evidence.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner on 16 October 2001 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The defendant is a duly qualified self-insured, with Federated Rural Electric Insurance Exchange as the servicing agent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. The plaintiff sustained an admittedly compensable injury on February 21, 1997, as a result of which the defendant filed a Form 60.
5. Plaintiff's average weekly wage was $982.24, yielding a maximum compensation rate of $512.00.
 ***********
Based upon all the evidence adduced from the record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a forty year-old male with a high school education.
2. Plaintiff was employed by employer-defendant as a first class lineman. Plaintiff's duties included repairing damaged electrical power lines.
3. Plaintiff has failed to show that he sustained a compensable injury by accident on October 3, 1996 while working for employer — defendant.
4. On February 21, 1997, plaintiff suffered an injury by accident at work while climbing a forty-foot utility pole. The pole fell to the ground while plaintiff was strapped to the pole. The pole landed diagonally across plaintiff's body, bounced up into the air, and landed on him a second time.
5. Shortly after the accident, plaintiff was transported by ambulance to the Lincoln Medical Center, where he underwent surgery.
6. As a result of the work accident, plaintiff suffered multiple injuries to his head, neck, back, legs, hips, and abdomen, as well as severe internal injuries, including multiple rib fractures, internal bleeding and blood clots, a large hemoperitoneal hemorrhage, two mesenteric tears, a retroperitoneal hematoma, cecal-cirrhosal tears, kidney contusion, and hematuria.
7. Plaintiff underwent two additional surgeries for internal injuries and digestive tract complications. The plaintiff was unable to stand erect until 3 months after the injury. In August, 1997, plaintiff had surgery to remove a parathyroid gland, and in November 1998, he had surgery to remove his gall bladder and for hiatal hernia repair.
8. On January 8, 1998, plaintiff returned to work in the position of assistant staking technician. Mr. Workman was assigned difficult tasks that were physically demanding.
9. The job description for an assistant staking technician, as written by employer-defendant, and provided to plaintiff's doctors for job approval, did not include the strenuous physical tasks that the plaintiff was assigned to do, such as chopping right-of-ways with a bush axe and moving large quantities of dirt with a shovel.
10. The physically demanding tasks that plaintiff was assigned aggravated his medical conditions and caused plaintiff to have large amounts of blood in his urine. As a result, plaintiff was hospitalized and was diagnosed with recurrent gross hematuria.
11. When plaintiff was released from the hospital and returned to work he was assigned to similar work duties. Plaintiff missed 70 days of work during his return to work period for medical reasons.
12. The plaintiff was frustrated with the status of his case due to, among other reasons, medical treatment not being authorized in a timely fashion or at all. Plaintiff related this frustration to an attorney he talked to at the time, Sean Coburn, about potentially representing plaintiff. This attorney was never retained by plaintiff. Plaintiff asked what could be done about the situation and jokingly mentioned the possibility of "whip[ing] his ass." The attorney responded "Well, you could [whip his ass] . . . but it would cost you money to hire an attorney to defend you for assault." The plaintiff thought this was humorous and repeated this joke several times subsequently to people who had knowledge of his situation, including his wife, coworkers, and current counsel. Mr. Coburn's affidavit states that plaintiff's remarks were made in a joking manner and that Mr. Coburn never had any concern that the plaintiff would carry them out.
13. On 1 February 2000, the plaintiff repeated this joke to his nurse caseworker. This nurse reported it to the company. On 7 February 2000 defendants terminated Mr. Workman upon written recommendation of defense counsel who cited the Seagraves case. Plaintiff was given no due process at the time of his firing. He was not told why he was being fired and was given no opportunity to explain his remark.
14. When plaintiff was terminated, Joe Joplin and Dirk Burleson did not conduct themselves as if they considered the plaintiff dangerous. They did not have security guards present at any time and accompanied plaintiff to his house to retrieve plaintiff's uniforms. Joe Joplin carried on casual conversations with the plaintiff, and when in the plaintiff's house, even inquired about buying plaintiff's gun case. When asked about his security concerns during the termination process, Joe Joplin testified, "I never even thought about it."
15. Before he was terminated, the plaintiff inquired with management about being assigned to a light duty job or supervisory position, but was told that the strenuous jobs were all they had to offer, and he could do that job or quit. Plaintiff refused to quit, primarily due to his financial condition.
16. Before he was terminated, plaintiff's coworkers helped compensate for his disabilities by allowing him to stay near the truck when possible.
17. Defendant has failed to show, by the greater weight of the evidence, that plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by employer-defendant.
18. Defendant presented no evidence that a worker who said what plaintiff did would have been terminated as plaintiff was. The case presented regarding the fired worker who committed assault presents a completely different factual paradigm.
19. Anthony H. Wheeler, a neurologist and pain management doctor, testified that plaintiff was unable to do the job of assistant staking technician, and that requiring plaintiff to do this job would probably cause him to "eventually become unemployable."
20. Dr. Alan F. Jacks, a general surgeon, testified that using a bush axe or shovel, and walking over rough terrain, would cause "significant strain within the abdomen," and "may create symptoms of pain and significant exertion."
21. Dr. Leon A. Dickerson, an orthopedic surgeon, testified that plaintiff would be unable to do a job that required him to do repetitive lifting, and that doing work such as using a bush axe or shovel would cause considerable pain.
22. Dr. Wheeler testified as follows regarding plaintiff's ability to return to work:
 ". . . My opinion is that he needs guidance and training and he needs a lighter job activity that would include, you know, no lifting over, say, ten pounds occasionally and the ability to change position as necessary, no static forward bending postures, limit reaching postures, and I wouldn't want him crawling, bending or squatting on a frequent basis or even on an occasional basis."
23. Plaintiff has been temporarily totally disabled since 7 February 2000, the day his employment was terminated.
24. Dr. Wheeler testified that plaintiff's knee problems consisted of patellafemoral syndrome, and were most likely a complication caused by plaintiff's back stabilization regimen. The greater weight of the evidence establishes that plaintiff's right knee condition is causally related to the accident on February 21, 1997 and/or the rehabilitative back therapy resulting from the accident.
25. Upon consideration of the testimony of Dr. Wheeler, Dr. Dominick Carbone, and the record as a whole, the greater weight of the evidence establishes that plaintiff's impotence, blood in urine, and problems with urination including a burning sensation upon urination and inability to control urination, were caused by the accident on February 21, 1997.
26. Dr. Brian A. Simpson, a psychologist, testified that there is a "very strong linkage" between plaintiff's development of depression, the accident on February 21, 1997, and "the other events that precipitated, such as chronic pain, such as functional limitations, such as occupation loss. . . ." Dr. Simpson further testified "it would be very improbable" that plaintiff's depression began only after he was terminated, and that in his opinion plaintiff's termination aggravated his depression, which "pre-existed the termination from work." The greater weight of the evidence establishes that plaintiff's depression is casually related to the accident on February 21, 1997.
27. Defendant made temporary total disability payments to plaintiff for some or all of the weeks during the period from 8 February 2000 through 19 December 2002.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of his employment on 21 February 1997. N.C. Gen. Stat. § 97-2(6).
2. The greater weight of the evidence of record establishes a causal relationship between plaintiff's injury by accident of February 21, 1997 and his right knee condition; his impotence, blood in urine, and problems with urination including a burning sensation upon urination and inability to control urination, and his depression.
3. Defendant has failed to show that plaintiff was terminated for misconduct and fault, unrelated to his compensable injury, for which a non-disabled employee would ordinarily have been terminated by employer-defendant. Seagraves v. Austin Co. of Greensboro,123 N.C. App. 228, 472 S.E.2d 397 (1996).
4. As a result of the compensable injury, subject to any credit owed, plaintiff is entitled to total disability compensation at the rate of $512.00 per week from February 8, 2000 and continuing until plaintiff returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the compensable injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including but not limited to providing plaintiff with treatment for the following: 1) right knee condition, 2) impotence, blood in urine, and problems with urination including a burning sensation upon urination and inability to control urination, and 3) depression. In addition, plaintiff is entitled to vocational rehabilitation services as set out in the North Carolina Industrial Commission Rules for Utilization of Rehabilitation Professionals in Workers' Compensation Claims. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant is entitled to a credit for temporary total disability compensation payments made during the period from 8 February 2000 through 19 December 2002.
2. Subject to the attorney's fee approved below and any credit owed, defendant shall pay total disability compensation to plaintiff at the rate of $512.00 per week from February 8, 2000 and continuing until plaintiff returns to work or until further order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum.
3. Defendant shall pay for medical expenses incurred or to be incurred as a result of the compensable injury as may reasonably be required to effect a cure, provide relief, or lessen the period of disability, including but not limited to providing plaintiff with treatment for the following: 1) right knee condition, 2) impotence, blood in urine, and problems with urination including a burning sensation upon urination and inability to control urination, and 3) depression. In addition, defendant shall provide vocational rehabilitation services.
4. A reasonable attorney's fee in the amount of twenty-five percent (25%) is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel in one lump sum of the accrued amount due plaintiff and thereafter by deducting every fourth compensation check due plaintiff.
5. Defendant shall pay the costs of this appeal.
 ORDER
1. This matter is hereby REFFERED to the Industrial Commission's Nurse's section for the designation of a doctor to perform a comprehensive evaluation of all of plaintiff's medical conditions. Defendant shall pay for this comprehensive evaluation and any treatment recommended by it.
2. Issues surrounding compensation potentially owed plaintiff regarding the loss of important organs are HEREBY RESERVED for determination at a later date.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER